[No. 38164-8-II.   Division Two.   May 11, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANCISCO BONA SAO, *Appellant*.

68

*Vanessa Mi-jo Lee*, for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Thomas C. Roberts, Deputy*, for respondent.

¶1 HUNT, J. — Francisco Bona Sao appeals his jury convictions for aggravated second degree felony murder

(based on first or second degree assault of his three-month-old son), felony harassment, and tampering with a witness, and his exceptional sentence for the aggravated murder. Sao argues that defense counsel denied him effective assistance by failing to propose an instruction requiring the State to prove intent and to disprove diminished capacity beyond a reasonable doubt. Sao also argues the trial court erred (1) in failing to instruct the jury about the presumption of innocence during the penalty phase of the trial; (2) in failing to define adequately the term "particularly vulnerable" for the jury during the penalty phase; and (3) by imposing an "excessive"[1] sentence of 600 months of confinement for the aggravated murder count. Finally, Sao argues that cumulative error requires reversal. We affirm.

## FACTS

### I. FELONY MURDER

¶2 In July 2007, Francisco Bona Sao lived in an apartment with his girl friend, Kathie Chung. They had two children together, LeiLani and Trumane. At the time, LeiLani was one year old and Trumane was three months old. Before Trumane's birth, Sao had a history of domestic violence against Chung and LeiLani. Sao and Chung also had a history of methamphetamine use: Chung, born August 19, 1988, had used "off and on" since she was 14 years old. VI Verbatim Report of Proceedings (VRP) at 455. At Chung's invitation, Sao had begun "doing methamphetamine" after Trumane's birth. VI VRP at 456-57.

¶3 On July 25, 2007, Sao returned home from work, ate dinner, gave three-month-old Trumane a bath, and then took Trumane into the bedroom to dress him. Although Sao had previously used methamphetamine,[2] he did not use it

---

[1] Br. of Appellant at 39.

[2] Sao had gotten "high the day before" and for a week-long period shortly before that. V VRP at 392.

the night of July 25. But Chung believed Sao was having hallucinations that night because he appeared "moody, [and] angry," V VRP at 392, and he was "acting weird," looked at her "really weird," and "didn't look the same." VI VRP at 464-65. According to Chung, Sao was "coming down off of methamphetamines." V VRP at 392. At some point that evening, Sao and Chung had an argument, Sao threatened to "sock [Chung] and kick [her] in [her] face," V VRP at 398, and Sao retreated from the living room back to the bedroom, where Trumane was.

¶4 Sometime after Sao returned to the bedroom, Chung heard two "thumping noise[s]." V VRP at 403. She thought Sao was banging on or punching the wall. Later, she went into the bedroom and saw that Trumane "didn't look right," V VRP at 406: His stomach was "kind of swollen," V VRP at 408, his "lips were blue," his body felt "cold," and "he was having a hard time breathing." V VRP at 407-08. Sao initially explained that "[m]aybe the baby swallowed some water" from the bath. V VRP at 408. But later that night he admitted to Chung that he had hit Trumane.

¶5 Chung wanted to take Trumane to the hospital, but Sao told her, "[N]o, not yet." V VRP at 409. Three or four more times that night, Chung suggested that they take Trumane to the hospital, but each time Sao said, "No." V VRP at 421. When eventually Sao performed CPR (cardiopulmonary resuscitation) on the infant, Trumane's breathing improved somewhat, but his condition ultimately worsened. While Chung ran to the car to take Trumane to the hospital, a neighbor intervened and called paramedics. Another neighbor came and gave the infant CPR. Sao fled, saying that there was a warrant out for his arrest. Before leaving, Sao told Chung, "Don't say nothing." V VRP at 420.

¶6 Paramedic Travis Smith found that Trumane was not breathing and had no pulse. Smith and other emergency responders began emergency treatment. When he began CPR, Smith discovered that "every rib below [Trumane's] armpit . . . was broken in half," injuries that were inconsistent with mere CPR. IV VRP at 208. Smith also noticed

bruising on Trumane's belly around the belly button. Despite the emergency workers' efforts, they were unable to restart Trumane's breathing or to establish a pulse. Paramedics transported Trumane by ambulance to nearby St. Clare Hospital, where he was pronounced dead shortly after.

¶7 Pierce County Medical Examiner Dr. Eric Leon Kiesel conducted an autopsy. He confirmed that many of Trumane's ribs were fractured and that CPR had not caused the fractures. Dr. Kiesel also found that Trumane's stomach and liver had been lacerated in several places by "blunt force trauma." VIII VRP at 726. Dr. Kiesel discovered bruises on Trumane's abdomen "consistent with bruises that would be caused by a hand." VIII VRP at 721. These findings led Dr. Kiesel to conclude that "blunt force trauma of the abdomen" had caused Trumane's death. VIII VRP at 741.

¶8 After Trumane's death, but before fleeing to California approximately two days later, Sao met with his cousin Pawn Tekkathook. Sao told Tekkathook he was worried that Chung might contact the police and "set[ ] him up" for the murder. V VRP at 346. Sao asked if he could borrow Tekkathook's handgun "to go pop [Chung] and take his daughter [LeiLani]." V VRP at 356. Tekkathook understood the phrase "pop" to mean "kill." V VRP at 356. Sao also said that he "wanted to kill the family," referring to Chung's family. V VRP at 357. Tekkathook refused to lend Sao the handgun. When Sao then offered to buy the gun for $400, Tekkathook again refused.

¶9 Police later arrested Sao in Stockton, California. Lakewood Police Detective Brent James Eggleston traveled to California to interview him. Eggleston advised Sao of his *Miranda*[3] rights. Over the course of the interview, Sao eventually admitted that he had (1) spanked Trumane "real, real hard" in the bedroom, VII VRP at 661-62; (2)

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"punched [Trumane] one time in the stomach . . . not on purpose, it was an accident," VII VRP at 662; (3) looked at Trumane and then "punched him . . . with his right hand [with] full force . . . as hard as he could . . . in the middle of his stomach" as he was yelling at Chung through the bedroom walls, VII VRP at 664; and (4) hit Trumane "probably three times, full, hard blows . . . as hard as [he could]." VII VRP at 667.

¶10 When Eggleston asked Sao if this was the reason that he had refused to take Trumane to the hospital, Sao replied, "[B]ecause I did it, yeah[, as well as] because of the warrants that [I] had." VII VRP at 665. When Eggleston asked Sao why he had acted this way, Sao stated, "[I]t was because of the stress from [Chung]." VII VRP at 668. During this interview, Sao never claimed that he thought he had been hallucinating or that he thought he was striking the family dog when he struck Trumane. Sao was transferred back to Washington.

¶11 While Sao was in the Pierce County jail, Eggleston learned about numerous recordings of jail phone conversations between Sao and Chung and obtained a warrant for copies of these recordings. In one phone call, Sao and Chung had agreed that "they were caught up with the wrong drug at the wrong time" and that Sao "didn't think that it would take over him, but that day it did take over him, and made him snap." IX VRP at 795. During another conversation, Sao apparently tried to induce Chung to testify falsely or to withhold relevant information from law enforcement agencies.

## II. Procedure

¶12 The State charged Sao with (1) second degree felony murder predicated on assault of a child in the first or second degree, RCW 9A.32.050(1)(b), with aggravating circumstances (a) that Sao "knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance," RCW 9.94A.535(3)(b), and/or (b) that Sao "used

his . . . position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense," RCW 9.94A.535(3)(n), count I; (2) felony harassment, RCW 9A.46.020(2)(b), count II; and (3) tampering with a witness, RCW 9A.72.120(1)(a), domestic violence, count III.

¶13 The trial was bifurcated such that the same jury decided guilt and the aggravating circumstances in separate sequential phases. Although not included in the record on appeal, the jury read a transcript of a conversation between Sao and Chung in which Sao evidently attempted to induce Chung to testify falsely or to withhold relevant information from law enforcement agencies. Sao retained forensic psychologist Dr. Vincent Thomas Gollogly to provide a mental evaluation and report. The State retained Western State Hospital forensic psychologist Dr. Marilyn Ronnei. Both interviewed Sao.

## A. Trial

¶14 Both psychologists testified at trial that Sao had told them he thought he was hitting the family dog, a miniature pinscher, rather than Trumane, his infant son. Having diagnosed Sao with "amphetamine induced psychosis disorder with hallucinations and delusions," IX VRP at 825, Dr. Gollogly testified (1) it was possible that, because of Sao's methamphetamine use, he thought he was hitting the family dog rather than Trumane; and (2) it was possible that Sao "was unable to form an intent to commit a crime against [Trumane]." IX VRP at 829. Dr. Ronnei testified there was "no evidence that [Sao] lacked the capacity to form the requisite mental state in this case, to form intent to commit the offense that he was charged with." 10a VRP at 934.

¶15 The trial court instructed the jury about the presumption of innocence, the elements of each offense, and diminished capacity. Despite Sao's having presented evidence that his mental capacity was impaired, defense counsel did not propose an instruction requiring the State

to prove intent and to disprove diminished capacity beyond a reasonable doubt. Nor did the trial court give such an instruction. The jury convicted Sao on all three counts.

¶16 During the aggravating circumstances phase of the trial, the parties presented additional argument but no further evidence about whether (1) Sao "knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance," RCW 9.94A.535(3)(b); or (2) Sao "used his . . . position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense," RCW 9.94A.535(3)(n). 11 VRP at 1043. As both parties had agreed, the trial court instructed the jury about the bifurcated proceeding, each aggravating circumstance, and determining whether the State had proved the charged aggravating circumstances beyond a reasonable doubt. Sao voiced no objections to any of the trial court's instructions; nor did he request or propose additional instructions or ask the trial court to repeat any instructions given during the preceding guilt phase of the trial, such as the presumption of innocence instruction. The jury found both aggravating circumstances.

## B. Sentencing

¶17 The parties agree that Sao's standard sentencing range for the murder count was 216 to 316 months of confinement based on an offender score of 7. In its sentencing memorandum, the State requested an exceptional 600-month sentence in light of the aggravating circumstances here and other sentences under comparable circumstances. The trial court sentenced Sao to 600 months of confinement for the second degree felony murder, count I, noting, "[E]ither of the aggravating circumstances, standing alone, would justify the exceptional sentence of 600 months." Clerk's Papers (CP) at 97.

¶18 Sao appeals all three of his convictions and his exceptional sentence for aggravated second degree felony murder, count I.

## ANALYSIS

### I. Jury Instructions

### A. Diminished Capacity—Ineffective Assistance

■■ ¶19 Sao first argues that his trial counsel denied him effective assistance by failing to propose an instruction requiring the State to prove intent and to disprove diminished capacity beyond a reasonable doubt. Sao argues that once defense counsel presented evidence that voluntary intoxication had impaired his (Sao's) mental capacity, the burden then shifted to the State "to prove intent and disprove diminished capacity beyond a reasonable doubt." Br. of Appellant at 21. Sao mistakenly equates the defense of diminished capacity by voluntary intoxication with self-defense, whereby once a defendant meets his initial burden of proof, its absence then becomes an element the State must prove beyond a reasonable doubt.[4]

¶20 We previously rejected the argument that Sao makes here:

> Unlike self-defense, intoxication causing diminished capacity is not a "true" defense to a criminal act. A criminal act committed by a voluntarily intoxicated person is not justified or excused. The fact of intoxication may raise a reasonable doubt as to the mental state element of the State's case, thus leading to an acquittal or conviction for a lesser included offense. *But, unlike self-defense, intoxication or diminished capacity does not add an additional element to the charged offense.*

*State v. James*, 47 Wn. App. 605, 608, 736 P.2d 700 (1987) (referencing RCW 9A.16.090) (emphasis added) (citation omitted). Thus, intoxication or diminished capacity does not add an additional element to the charged offense, which the

---

[4] *See, e.g., State v. Miller*, 89 Wn. App. 364, 367-68, 949 P.2d 821 (1997) (Once a defendant produces some evidence of self-defense, "[t]he burden then shifts to the State to prove the absence of self-defense." (citing *State v. Walden*, 131 Wn.2d 469, 473-74, 932 P.2d 1237 (1997))).

State must disprove at trial. *James*, 47 Wn. App. at 607-08. Because, therefore, Sao was not legally entitled to a burden-shifting instruction, defense counsel did not perform deficiently in failing to propose one. Thus, Sao does not meet the deficient performance prong of the well-settled ineffective assistance of counsel test.[5]

## B. Presumption of Innocence—Penalty Phase

¶21 Sao next argues that the trial court erred in failing to instruct the jury about the presumption of innocence a second time,[6] during the penalty phase of the bifurcated trial. Sao not only failed to object to the trial court's giving this instruction solely during the guilt phase of the trial, but he also affirmatively represented that the instructions the trial court proposed to give for the aggravating circumstances phase accurately reflected the law.[7] Therefore, he has failed to preserve this issue for appeal. *See* RAP 2.5(a).

¶22 Generally, an issue cannot be raised for the first time on appeal unless it is a " 'manifest error affecting a constitutional right.' " *State v. Munguia*, 107 Wn. App. 328, 340, 26 P.3d 1017 (2001) (quoting RAP 2.5(a)). Characterizing an issue as "constitutional" does not automatically

---

[5] To prove ineffective assistance of counsel, Sao must show (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced the outcome of his case. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

[6] During the initial guilt phase of the trial, the trial court had instructed the jury:

A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.

VRP (July 23, 2008) at 10; CP at 31.

[7] When asked whether he had any objections to the instructions the trial court intended to use, defense counsel remarked, "Your Honor, I believe that they accurately reflect the applicable WPICs." 11 VRP at 1040 (referencing the *Washington Pattern Jury Instructions—Criminal* (WPIC)). The trial court then noted, "Then, [defense counsel] does not appear to have any concerns with these instructions." 11 VRP at 1040. Again, Sao voiced no objections.

mandate review of an issue a criminal defendant has failed to raise below. *Munguia*, 107 Wn. App. at 340 (citing *State v. McFarland*, 127 Wn.2d 322, 333-34, 899 P.2d 1251 (1995)). On the contrary, Sao must show actual prejudice in order to establish that the claimed error is "manifest." *Munguia*, 107 Wn. App. at 340 (citing *McFarland*, 127 Wn.2d at 333-34). Here, Sao contends that the trial court's failure, sua sponte, to instruct the jury a second time about his presumption of innocence during the aggravating circumstances portion of the bifurcated trial denied him due process under the Fourteenth Amendment and Washington's constitution. This argument fails.

¶23 The law in Washington is well settled that "[t]he presumption of innocence does not apply to the penalty phase in special sentencing proceedings." *State v. Benn*, 120 Wn.2d 631, 668, 845 P.2d 289, *cert. denied*, 510 U.S. 944 (1993); *see also State v. Finch*, 137 Wn.2d 792, 865, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999). Because failure to instruct the jury about the presumption of innocence during the penalty phase was not error, Sao has demonstrated neither a constitutional nor a manifest error warranting our review.

### C. Definition of *Particularly Vulnerable*—Penalty Phase

¶24 Sao next argues that the trial court failed to define adequately the term "particularly vulnerable" in the penalty phase jury instructions. Br. of Appellant at 35. The trial court instructed the jury:

> A victim is "particularly vulnerable" if he or she is more vulnerable to the commission of the crime than the typical victim of assault of a child in the first or second degree. The victim's vulnerability must also be a substantial factor in the commission of the crime.

CP at 62. Sao did not object to this instruction.[8] Nevertheless, he contends he may challenge it for the first time on

---

[8] *See supra* note 7.

appeal because of the "due process vagueness doctrine."[9] Br. of Appellant at 35. We disagree.

¶25 Again, characterizing an error as constitutional does not automatically allow a defendant to bypass RAP 2.5(a). As Division One of our court has explained, "[A defendant's] failure to propose a defining instruction that correctly stated the law precludes him from arguing on appeal that the absence of such an instruction was error." *State v. Whitaker*, 133 Wn. App. 199, 233, 135 P.3d 923 (2006) (rejecting defendant's due process vagueness challenge where he failed to propose instruction), *review denied*, 159 Wn.2d 1017, 157 P.3d 404, *cert. denied*, 552 U.S. 948 (2007). Because Sao failed to propose an alternate instruction, we do not reach his argument challenging the instruction to which he assented and that the trial court gave.

## II. Exceptional Sentence

¶26 Sao next argues that his 600-month exceptional sentence was "clearly excessive," thus warranting

---

[9] Sao submitted a statement of additional authorities, RAP 10.10, citing a newly published opinion from Division One of our court, *State v. Gordon*, 153 Wn. App. 516, 223 P.3d 519 (2009). But Sao fails to "identify the issue for which [the] authority is offered," as required by RAP 10.8. We assume, therefore, that he cites this case in support of his argument on the adequacy of the trial court's definition of "particularly vulnerable" in the aggravating circumstance phase of his bifurcated trial. Br. of Appellant at 35.

*Gordon* does not help Sao. Unlike the trial court here, the *Gordon* trial court failed to instruct the jury on the definition of "particularly vulnerable," which would have included the "elements" the State had to prove beyond a reasonable doubt to establish this aggravating sentencing circumstance. 153 Wn. App. at 529. Although the *Gordon* court held that aggravating circumstances are functional equivalents of the elements of the aggravated crime for purposes of instructing the jury on these aggravating sentencing circumstances, 153 Wn. App. at 533, the court did not have before it and, therefore, did not address the issue that Sao raises here for the first time—that the trial court was required to instruct the jury on the presumption of innocence in the aggravating sentencing circumstances phase of the trial. Rather, the *Gordon* court's discussion of the functional equivalent of substantive crime elements was solely for purposes of underscoring the necessity of defining for the jury the specific legally-required components of the aggravating circumstances, rather than leaving the jury to speculate based on the ordinary meaning of these terms.

reversal under RCW 9.94A.585(4).[10] Br. of Appellant at 39. We disagree.

¶27 We review an exceptional sentence under an abuse of discretion standard; we will reverse only if we find the length clearly excessive. *State v. Ritchie*, 126 Wn.2d 388, 392-93, 894 P.2d 1308 (1995). A sentence is clearly excessive if it is based on untenable grounds or untenable reasons or if it is an action *no reasonable judge would have taken*. *State v. Branch*, 129 Wn.2d 635, 649-50, 919 P.2d 1228 (1996).[11]

¶28 Sao contends that the trial court "reviewed the facts, but did not specifically explain why it elected to impose 600 months or attempt to tie the sentence length to the aggravators found by the jury." Br. of Appellant at 40. This assertion is irrelevant. As the Supreme Court stated in *Ritchie*, a trial court is under no obligation to "articulate reasons for the length of an exceptional sentence." 126 Wn.2d at 392. We note, however, as the State pointed out in its sentencing memorandum, that 600 months is a lesser sentence compared to other cases where parents have killed their children.[12]

---

[10] RCW 9.94A.585(4):

To reverse a sentence which is outside the standard sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

[11] *See also State v. Kolesnik*, 146 Wn. App. 790, 802, 192 P.3d 937 (2008), *review denied*, 165 Wn.2d 1050, 208 P.3d 555 (2009).

[12] *See, e.g., State v. Berube*, 150 Wn.2d 498, 501, 512, 79 P.3d 1144 (2003) (affirming 640-month sentence for conviction of homicide by abuse in death of 23-month-old child, finding three aggravating factors to justify the exceptional sentence: victim vulnerability, abuse of trust, and deliberate cruelty); *State v. Russell*, 69 Wn. App. 237, 241, 249-50, 848 P.2d 743, *review denied*, 122 Wn.2d 1003, 859 P.2d 603 (1993) (affirming 828-month sentence for conviction of homicide by abuse in death of 20-month-old child, finding four aggravating factors to justify the exceptional sentence: deliberate cruelty, victim vulnerability, abuse of trust, and lack of genuine remorse); *State v. Creekmore*, 55 Wn. App. 852, 854, 860, 783 P.2d 1068 (1989), *review denied*, 114 Wn.2d 1020, 792 P.2d 533 (1990) (affirming 720-month sentence for conviction of felony murder in the second degree in death of 3-year-old child, finding four aggravating factors to justify the

¶29 As we previously noted, the State charged and the jury found the following aggravating circumstances: (1) Sao "knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance," and/or (2) Sao "used his . . . position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense." CP at 5. In its "Findings of Fact and Conclusions of Law for Exceptional Sentence," the trial court explained that, based on either aggravating circumstance, "there is a substantial and compelling reason justifying an exceptional sentence." CP at 97. In pronouncing the exceptional sentence, the trial court noted:

> In this case, the evidence included testimony that you hit Trumane with your clenched fist three to four times as hard as you could with your whole body weight leaving multiple bruises on his abdomen, which became swollen and distended over time while he suffered. After that, you flipped Trumane over and spanked him three to four times with a flat open hand leaving bruises on his bottom.
>
> When it was evident that Trumane needed medical aid due to his gasping and stopped breath, the body had turned blue and cold, you still waited on your decision whether or not to seek medical aid for Trumane. You did not seek medical aid for Trumane, although you got a heater, some blankets, and some warm water in an effort to warn him up after his body turned cold. You went outside to smoke a cigarette.
>
> The urging of your friends to seek medical attention for Trumane did not move you to action to call 911 for medical assistance. You ignored your friend[s'] warnings and suggestions after they arrived at your apartment, and they saw Trumane had turned cold and blue, because what appears to be you had outstanding traffic warrants and feared that you might be arrested for those.

exceptional sentence: victim vulnerability, multiple incidents, abuse of trust, and lack of remorse).

Once the ambulance had been called by a neighbor, you fled from the apartment and hid among your friends for days while the police sought your whereabouts. You made plans to, and fled this state, and were apprehended in California.

XII VRP at 1076-77.

¶30 We hold, therefore, that Sao's exceptional 600-month sentence for aggravated second degree felony murder of his infant son was not clearly excessive and that the trial court did not abuse its discretion in imposing it.

### III. Cumulative Error

¶31 Finally, Sao argues he is entitled to reversal under the cumulative error doctrine. We disagree. The cumulative error doctrine applies when several errors occurred, denying the defendant a fair trial, even though no single error warrants reversal. *State v. Hodges*, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003), *review denied*, 151 Wn.2d 1031, 94 P.3d 960 (2004). As we have already held, the trial court committed no errors; nor did defense counsel render ineffective assistance. Thus, Sao fails to show cumulative error warranting reversal of his convictions and exceptional sentence for aggravated murder.

¶32 We affirm Sao's three convictions and his exceptional sentence for aggravated second degree felony murder.

QUINN-BRINTNALL, J., and HOUGHTON, J. PRO TEM., concur.

Review denied at 170 Wn.2d 1017 (2011).