FILED
COURT OF APPEALS
DIVISION II

2013 SEP 10 AM 8: 38

STATE OF WASHINGTON
BY
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42565-3-II |
| Respondent, | |
| v. | |
| KENNETH RAYMOND NORDSTROM, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — A jury found Kenneth Raymond Nordstrom guilty of first degree burglary, second degree assault, and fourth degree assault after he unlawfully entered his girlfriend's apartment and attacked his girlfriend's teenage daughter and the daughter's pregnant best friend. He appeals his convictions and sentence, claiming that the trial court erred in (1) failing to redact prejudicial statements from a 911 call, (2) denying Nordstrom surrebuttal, (3) imposing a "clearly excessive" exceptional sentence, and (4) finding Oregon's second degree assault statute legally comparable to Washington's second degree assault statute. Additionally, he claims the prosecutor committed misconduct by shifting the burden of proof to Nordstrom. We affirm his convictions and sentence because of the issues he preserved for appeal; Nordstrom fails to demonstrate any reversible error.

FACTS

Nordstrom had a history of hostility with AD (his girlfriend's teenage daughter) and AG (AD's best friend);[1] Nordstrom felt that AD disrespected her mother, MD (Nordstrom's girlfriend). He also did not approve of AD and AG's friendship because AG was black and as

---

[1] We use initials to protect the privacy of victims under 18 years of age.

Nordstrom described her, a gang-banger. Because of his tenuous relationship with AD, MD prohibited Nordstrom from being in MD's home unless MD was present.

Early one September morning in 2010, AD and AG slept in MD's apartment while MD worked a night shift. They were suddenly awakened by Nordstrom, who stood over them and began hitting AD and the pregnant AG. AD ran to the kitchen to call 911, but Nordstrom followed her and continued to hit her. While Nordstrom attacked AD in the kitchen, AG ran outside with her cellular telephone and contacted 911, which dispatched officers to MD's apartment. Before the officers arrived, Nordstrom fled. As a result of Nordstrom's attack, AD suffered numerous bruises on her arms and shoulders, swelling on her face, and a fractured nose. AG's injuries included a bloody nose and a bruised thumb.

The State charged Nordstrom with first degree burglary[2] with an aggravator alleging that Nordstrom knew of AG's pregnancy,[3] second degree assault[4] committed against AD, and fourth degree assault[5] committed against AG. Before trial, Nordstrom did not reveal an alibi defense and instead claimed a "general denial" defense. Clerk's Papers (CP) at 3.

At trial, the State theorized that Nordstrom entered MD's second-story apartment through the sliding door on the balcony because AD had locked the front door, and the sliding patio door did not lock. Nordstrom did not possess keys to the front door and, had he opened the front door, an alarm would have sounded. Instead, the alarm first rang when AG opened the door to exit the

---

[2] RCW 9A.52.020(1)(b). The charging document listed AD and AG as victims.

[3] RCW 9.94A.535(3)(c).

[4] RCW 9A.36.021(1)(a).

[5] RCW 9A.36.041.

apartment and call 911. Multiple witnesses, including Nordstrom, testified that Nordstrom had accessed the apartment through the balcony door on at least one earlier occasion.

The State moved to admit into evidence AG's 911 call. In the 911 call, an excited AG recounted how Nordstrom showed up in AD's apartment and started beating the girls. Responding to the 911 dispatcher's questions, AG described Nordstrom, recounted the night's events, and speculated that he came there to beat them up because he disliked African Americans. The 911 call also contained the following passage to which no particular attention was drawn at trial: "[AD's] mom is a fucking drug addict. They're [MD and Nordstrom] both tweakers. They both do meth. So, she's crazy and he's crazier. And they are just both crazy. That's the only thing about it. I really don't know why she let him in the house." 2B Verbatim Report of Proceedings (VRP) at 345. Nordstrom objected to the 14-minute 911 call as a whole, simply claiming that it was inadmissible hearsay. He did not reference the passage relating to Nordstrom's drug use, nor did he object to its potential prejudicial effect. Instead, he argued,

> [T]his is sort of a rambling long thing that is talking more about -- more about -- than an excited utterance or even a present sense impression. She is talking about past events. She's going to do this. She's going to do that. So, I'd say it's not admissible unless you redacted it heavily [to allow only the jury to hear only the hearsay-exception materials].

1A VRP at 63. The trial court admitted the call, ruling that it consisted of hearsay exceptions.

At trial, Nordstrom testified that he did not commit the burglary and assault against AD and AG; instead, he spent that night drinking with an old friend, Carl Kessler. He claimed that after drinking, he drove to a Portland job site at employer Greg Thomas's house where he slept off his inebriation in his car. The State called MD to rebut Nordstrom's testimony because when Nordstrom was in jail, he told MD that on the night of the crimes, he was with an acquaintance, "Shannon," at Thomas's house—not with Kessler. During MD's testimony, the State played a

jail phone call snippet[6] in which Nordstrom told MD that he had been with "Shannon" the night of the crimes.

Based on this rebuttal evidence, Nordstrom wanted to offer surrebuttal. The trial court expressed skepticism and said surrebuttal testimony would be improper "unless there is something completely different [that] comes up [during rebuttal]." 3A VRP at 608. In an offer of proof, Nordstrom offered that he wanted to clarify the whole context of his jail phone call. Nordstrom also offered that when he told MD he was with "Shannon" on the night of the crimes, he was lying. Defense counsel stated that "Shannon" was Shannon Wink. During cross-examination of Nordstrom's offer of proof, Nordstrom explained that he had seen Wink, Kessler, and Scott Parks on the night of the crimes but that the defense investigator had not pursued these individuals. Defense counsel objected and noted that Nordstrom's offer was exceeding the scope of rebuttal. The trial court agreed.

During closing, the prosecutor argued,

> What [Nordstrom] testified to is that he went out somewhere in Portland. Ran into some random friend and that it was his friend. This was one of his friends. They go back -- they go so far back, this person that he was with. But, you didn't hear from him today. You didn't hear from Shannon Wink either, the person that he told [MD] on the phone that he was with. You know, his friends.

3B VRP at 690. Nordstrom objected to this argument as burden shifting, and the trial court advised the jury that the defense had no burden to establish innocence. In rebuttal, the prosecutor again argued, "This work site he was at. It was at somebody's house. Somebody -- somebody -- Gary would have woken up and found [Nordstrom] at his house. But, you didn't hear from Gary. Nor did you hear from Carl." 3B VRP at 748. Nordstrom again objected, and

---

[6] The jail phone call was lengthy, but the trial court limited the State to playing just the portion relevant to rebutting Nordstrom's testimony.

the trial court reiterated that the State bore the burden of proof. The jury found Nordstrom guilty on all counts and found by special verdict that he knew AG was pregnant during the burglary.

At sentencing, when the trial court calculated Nordstrom's offender score, it considered his prior Oregon second degree assault conviction. The trial court found that Nordstrom's Oregon second degree assault conviction was comparable to Washington's third degree assault. Thus, the trial court added an offender score point for this Oregon conviction.

The trial court sentenced Nordstrom within the standard range and imposed concurrent sentences. The trial court found that aggravating circumstances warranted an additional 40-month exceptional sentence to run consecutive to the other sentencing terms because the jury found that Nordstrom knew AG was pregnant during the burglary, an aggravating factor. The trial court said that in imposing the exceptional sentence, it also considered that Nordstrom had "maxed out" his offender score. 4 VRP at 835. Nordstrom appeals.

ANALYSIS

I. 911 RECORDING

Nordstrom claims that the trial court erred in refusing to redact irrelevant, prejudicial evidence from the 911 call recording, denying Nordstrom a fair trial. Because Nordstrom failed to challenge the 911 recording for unfair prejudice at trial, he did not preserve this issue for appeal and, even if preserved, any error was harmless.

A. Standard of Review

We generally will not consider theories or arguments different from those advanced at trial. *State v. McDonald*, 74 Wn.2d 474, 480, 445 P.2d 345 (1968). Parties may only assign

error on appeal on the specific ground of the evidentiary objections they raised at trial. *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). Specific objections are necessary at trial so that the judge may understand the question raised and the adversary may be afforded an opportunity to remedy the claimed defect. *Boast*, 87 Wn.2d at 451.

We may, however, consider claims raised for the first time on appeal when those claims involve a manifest error affecting a constitutional right. RAP 2.5(a)(3). Generally, evidentiary errors are not of constitutional magnitude and therefore require reversal only if the defendant is prejudiced. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is prejudicial when "within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). The question is whether the untainted evidence is sufficient to overwhelmingly support the jury's finding of guilt. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011).

B. Not Preserved

Nordstrom challenges for the first time on appeal the prejudicial effect of the following statements in the 911 call:[7] "[AD's] mom is a fucking drug addict. They're [MD and Nordstrom] both tweakers. They both do meth. So, she's crazy and he's crazier. And they are just both crazy. That's the only thing about it. I really don't know why she let him in the house." 2B VRP at 345.

Before trial, Nordstrom never argued that this passage was unfairly prejudicial. Instead, he argued that the entire recording contained improper hearsay. But the State did not offer these statements to prove the truth of the matter asserted and because Nordstrom never objected to the

---

[7] The trial court admitted into evidence AG's entire 911 call.

potential prejudice in this passage, he never allowed the trial court to remedy any questions of prejudice at trial. In addition, he does not include a RAP 2.5(a)(3) analysis arguing a manifest error affecting a constitutional right. Thus, Nordstrom failed to preserve this error for appeal.

Even if Nordstrom preserved this alleged error, his argument still fails. In addressing his argument on the merits, and assuming without deciding that he raises a constitutional error, we must analyze whether untainted evidence overwhelmingly supports the jury's guilty verdicts. *See Anderson*, 171 Wn.2d at 770. Here, the jury heard overwhelming evidence. MD testified that she forbade Nordstrom from being in the apartment when she was absent, and she changed the door locks so that Nordstrom could not freely enter on his own; had he opened the front door, an alarm would have sounded. MD also testified that the balcony door did not lock, and it was undisputed that Nordstrom had once scaled the back balcony to access the apartment before.

And importantly, both victims knew Nordstrom and identified him as the assailant and medical professionals confirmed the victims' injuries. Finally, Nordstrom admitted that he knew AG was pregnant at the time. Therefore, even had Nordstrom preserved this issue for appeal and demonstrated that the trial court abused its discretion in admitting the portion of the 911 recording he seeks to challenge for the first time on appeal, he cannot demonstrate prejudicial effect compromising his right to a fair trial and warranting a retrial.

## II. SURREBUTTAL TESTIMONY

Next, Nordstrom argues that the trial court erred in refusing to allow him to testify in surrebuttal, denying him due process. We conclude that the trial court did not err in denying Nordstrom's motion to present surrebuttal evidence.

We review the trial court's refusal to allow surrebuttal evidence for a manifest abuse of discretion. *State v. Luvene*, 127 Wn.2d 690, 709-10, 903 P.2d 960 (1995). A trial court abuses

its discretion when it makes decisions that are manifestly unreasonable or based on untenable grounds or reasons. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

"Simply stated, the function of surrebuttal is to rebut the rebuttal." *State v. Harris*, 12 Wn. App. 381, 386, 529 P.2d 1138 (1974). "It is not the function of surrebuttal to provide the defendant an opportunity to present evidence cumulative or confirmatory of that which has been, or ought to have been, presented in his case-in-chief." *Harris*, 12 Wn. App. at 386. Mere contradiction by a party who has already testified to the contrary is not impeachment such as to justify surrebuttal. *See State v. Stambach*, 76 Wn.2d 298, 302, 456 P.2d 362 (1969).

Here, Nordstrom's desire to testify in surrebuttal stemmed from his earlier testimony that he did not commit the crimes because he was drinking with Kessler before spending the night in his car at a Portland job site. The State rebutted this alibi by calling MD, who testified that Nordstrom told her over the phone that on the night of the crime, he was with Wink, not Kessler.

As a result, Nordstrom wanted to clarify and offer context for the whole phone conversation. And he said that he lied when he told MD that he was with Wink. The trial court ruled that Nordstrom's testimony regarding lying about Wink would be improper surrebuttal evidence, presumably because testifying to the context of the phone call did not rebut MD's testimony that Nordstrom told her that he was with Wink the night of the crimes.

Nordstrom had already testified once and his proposed surrebuttal would not impeach MD's rebuttal testimony. Therefore, we hold that the trial court's denial of surrebuttal was not manifestly unreasonable or based on untenable grounds.

III. PROSECUTORIAL MISCONDUCT

Next, Nordstrom argues that the prosecutor committed misconduct when she repeatedly argued that the jury should convict Nordstrom based on his failure to call certain witnesses to corroborate his alibi. We disagree that the prosecutor committed misconduct.

A. Standard of Review

To prevail on a prosecutorial misconduct claim, a defendant must show that in the context of the record and all the trial circumstances, the prosecutor's conduct was improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). We consider the prosecutor's alleged improper conduct in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Anderson*, 153 Wn. App. 417, 430, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010). If the defendant objected at trial, he must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

Under the missing witness doctrine, where a party fails to call a witness the party would properly be expected to call as part of its case, and the witness is within that party's control, the jury may draw an inference that the witness's testimony would be adverse to that party. *State v. Blair*, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991) (citing *State v. Davis*, 73 Wn.2d 271, 276, 438 P.2d 185 (1968), *overruled on other grounds by State v. Abdulle*, 174 Wn.2d 411, 275 P.3d 1113 (2012)). Generally, the missing witness doctrine does not apply where the witness is equally available to both parties. *Blair*, 117 Wn.2d at 490. For a witness to be "available," there

must have been such a community of interest between the party and the witness, or the party must have a superior opportunity for knowledge of a witness, that in ordinary experience, it would have been reasonably probable that the party would have called the witness to testify for the party except for the fact that his testimony would have been damaging. *Blair*, 117 Wn.2d at 490 (citing *Davis*, 73 Wn.2d at 277). When the missing witness doctrine is satisfied, there is no misconduct where the prosecutor argues inferences relating to the missing witness to the jury. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). Moreover, the State may comment on the lack of evidence to support the defendant's exculpatory theory. *State v. Pierce*, 169 Wn. App. 533, 551 n.7, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012).

## B. Analysis

Both parties rely on the missing witness doctrine. Nordstrom cites *Blair* to support his claim that the missing witness doctrine does not apply. The State asserts that the missing witness doctrine applies and that its arguments were proper. In *Blair*, Blair argued that the prosecutor had improperly shifted the burden of proof by commenting on his failure to call witnesses when he had no duty to do so. 117 Wn.2d at 484. Our Supreme Court disagreed and held that because Blair testified that he knew the names and whereabouts of the potential witnesses, and because the State did not know these people who were identified only by their first names, these potential witnesses were within the "peculiar availability" of the defense. *Blair*, 117 Wn.2d at 491.

As a threshold matter, we note that Nordstrom did not notify the State pretrial that he was asserting an affirmative alibi defense. *See* CrR 4.7(b)(2). And because Nordstrom did not disclose his alibi defense or any witnesses that could support his defense, the State was unaware

of these potential witnesses until Nordstrom testified. We reject Nordstrom's claim that the State knew of these witnesses, and we conclude instead that these witnesses were solely within Nordstrom's control. Finally, the State may argue, as it did here, inferences that arise from the evidence or from the lack of evidence supporting an exculpatory theory. *See Pierce*, 169 Wn. App. at 551 n.7.

Here, the trial court instructed the jury that "the lawyers' statements are not evidence." CP at 84 (Instruction No. 1). It also instructed the jury that "[a] reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence." CP at 86 (Instruction No. 2). *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) ("It is not misconduct, however, for a prosecutor to argue that the evidence does not support the defense theory."), *cert. denied*, 514 U.S. 1129 (1995).

During closing, the prosecutor questioned why Nordstrom did not call Kessler to testify that he was with Nordstrom the night of the crimes if Nordstrom and Kessler were such good friends. During rebuttal, the State argued that "Gary"[8] should have found Nordstrom asleep in his car in the morning. Later, the State argued once more in rebuttal, "[I]f the witnesses that you are using that you decide to raise in your defense are in your control then it --." 3B VRP at 749. Nordstrom timely objected to each of these arguments.

Like *Blair*, until he testified, only Nordstrom knew of Kessler and Thomas and their alleged role as potential alibi witnesses, so these witnesses were within Nordstrom's peculiar control. Nordstrom had not disclosed Kessler or Thomas as potential witnesses, and the record

---

[8] When the prosecutor referred to "Gary," she must have meant Thomas, Nordstrom's employer who owned the property at which Nordstrom claimed to have slept in his car.

makes no reference to Kessler or Thomas until Nordstrom testified. Accordingly, the State did not improperly shift the burden of proof when it commented on Nordstrom's failure to call Kessler and Thomas and the absence of evidence supporting Nordstrom's testimony.

Similarly, the State did not shift the burden of proof by commenting on Nordstrom's failure to call Wink even though the State knew of Wink. The record shows that Nordstrom referred to her in the jail phone recording only as "Shannon." Like *Blair*, the State's knowledge of a first name without additional information, like a full name or known whereabouts, does not give rise to a witness's equal availability. Accordingly, the State did not share such a community of interest with Wink that in ordinary experience, it would have been reasonably probable for the State to call her to testify. *See Blair*, 117 Wn.2d at 490. In addition, because the State may properly argue inferences from the evidence, or lack of evidence, the prosecutor did not commit misconduct in arguing inferences relating to Kessler, Thomas, and Wink's absence at trial. *See Cheatam*, 150 Wn.2d at 652. Nordstrom demonstrates no error.

## IV. EXCEPTIONAL SENTENCE

Nordstrom next claims that the trial court abused its discretion in imposing a clearly excessive exceptional sentence based on AG's pregnancy. Specifically, he contends that the trial court lacked a rational basis to impose an exceptional sentence. We disagree.

To reverse a sentence outside of the standard range, we must find that either (1) the sentencing court's reasons are unsupported by the record or do not justify a sentence outside the standard range, or (2) the sentence imposed was clearly excessive. RCW 9.94A.585(4). And

under RCW 9.94A.535(3)(c), an aggravating circumstance occurs when a defendant commits a violent offense and knows that the victim was pregnant.

We will not reverse the length of an exceptional sentence as "clearly excessive" absent an abuse of discretion. *State v. Ritchie*, 126 Wn.2d 388, 392, 894 P.2d 1308 (1995). A sentence is clearly excessive if it is based on untenable grounds or untenable reasons, or if it is an action no reasonable judge would have taken. *State v. Sao*, 156 Wn. App. 67, 80, 230 P.3d 277 (2010), *review denied*, 170 Wn.2d 1017 (2011).

Nordstrom committed a violent offense against AG, first degree burglary,[9] and he acknowledged that he knew she was pregnant at the time. He assaulted her by hitting her three to five times, causing a bloody nose and bruised thumb. Here, the jury found that Nordstrom knew that AG was pregnant at the time of the crimes. Evidence supported this finding. Because the trial court applied the aggravating circumstance found by a jury, and the record supports this finding, the trial court did not base the exceptional sentence on untenable grounds or reasons.

Next, Nordstrom argues that the 40 months added to the standard range was clearly excessive. Nordstrom, however, does not demonstrate how the additional time is unreasonable. The trial court reasonably imposed the exceptional sentence because the jury found that Nordstrom knew AG was pregnant during the crime and because Nordstrom had a "maxed out" offender score. 4 VRP at 835. Further, under our antimerger statute, the trial court could have

---

[9] Under former RCW 9.94A.030(50) (2009), a violent offense includes any class A felony. First degree burglary is a class A felony. RCW 9A.52.020(2).

No. 42565-3-II

imposed separate sentences for both the burglary and the assaults. RCW 9A.52.050. Accordingly, the trial court did not impose a clearly excessive sentence or abuse its discretion. *See* RCW 9.94A.585(4).

V. COMPARABILITY OF FOREIGN OFFENSE

Finally, Nordstrom argues that the trial court erred when it found that his Oregon second degree assault conviction was comparable to a Washington second degree assault. Nordstrom is mistaken. The trial court did not find that Oregon's second degree assault was comparable to a Washington second degree assault; instead, the trial court found that the Oregon conviction was comparable to a Washington *third* degree assault. Because Nordstrom alleges error about something that did not occur, and he does not question whether Oregon's second degree assault and Washington's third degree assault statutes are legally comparable, he presents nothing for us to consider.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J.

We concur:

QUINN-BRINTNALL, J.

FEARING, J.

14